SASS & CRAWFORD VS THOMAS ET AL.

Opinion delivered October 27, 1906.

(89 S. W. Rep. 656).

**1.** *Fraud—Contract.*

Fraud in the execution of a contract renders it void and the party
perpetuating such fraud gains nothing by reason of such contract.

**2.** *Contract—Fraud—Jurisdiction of Courts.*

Courts of law have concurrent jurisdiction with Courts of Equity to
prevent the introduction of a fraudulent contract as evidence in
behalf of fraudulent party.

**3.** *Evidence—Parol—Fraudulent Contract.*

The execution of a fraudulent lease may be shown by parol in an
action for unlawful detainer.

**4.** *Pleading—Reply.*

Under Sec. 5022, 5025, 5043 Mansfield's Dig. (Ind. Ter. Ann St. 1889
Sec. 3227, 3230, 3248) all material new matter in the answer shall be
considered as controverted, unless it contains as allegation of a
counter claim or set-off, and no reply is necessary.

Appeal from the United States Court for the Southern
District of the Indian Territory; before Justice Hosea Townsend,
June 15, 1903.

Action by Minnie Thomas̄ and another against Sass & Crawford. From a judgment for plaintiffs, defendants appeal. Affirmed.

This is an action of unlawful detainer, brought by the appellees, Minnie G., and her husband, Charles Thomas, to recover possession of certain premises located in Ardmore, I. T. The amended complaint, upon which the case was tried, in substance alleges: That the plaintiffs are husband and wife, and citizens of the Chickasaw Nation, and that Minnie G. Thomas is a citizen by blood of the Chickasaw tribe of Indians. That the defendants are citizens of the United States, and reside at Ardmore, doing business under the firm name of Sass & Crawford. That Minnie G. Thomas is the owner in her own right of the premises in controversy. That at the time of the execution of the lease to defendants her name was Minnie G. McCauley. Her then husband has since died, and after his death she married her coplaintiff. That by a written contract, signed by herself and her then husband, McCauley, on the 20th day of October, 1894, she leased the premises in controversy to Munzesheimer & Daube, a firm composed of H. Munzesheimer and S. Daube, for a period of three years from that date. That Munzesheimer & Daube entered upon and occupied the premises as tenant of plaintiff until some time in 1897, at which time they executed a deed of assignment for the benefit of their creditors to W. A. Ledbetter, the assignee named in the deed of assignment. Ledbetter was afterward, for some cause, appinted by the court as receiver of all of the property of the firm, and under an order of the court offered for sale and sold to the defendants all of the firm's title to the premises in controversy. The complaint alleges that the written contract of lease was turned over to Munzesheimer & Daube, and no copy of it retained by her, and demands that it be produced by the defendants at the trial. There

was an allegation of forfeiture of the lease by certain acts of the defendants set up in the complaint, but as that issue was not submitted to the jury, and no exceptions saved, it is not necessary to further notice it. The defendants filed a general demurrer to the complaint, which was overruled by the court. They then filed their answer, in which they denied the execution of the rental contract set up by plaintiffs in their amended complaint; deny that any such contract was ever turned over to Munzesheimer & Daube; but allege that on said 20th of October, 1894, the plaintiff, Minnie G. Thomas (then McCauley), by a certain written instrument bearing said date, rented the said premises to Munzesheimer & Daube. Said lease is as follows: "This contract made and entered into by and between Minnie G. McCauley, party of the first part, and Herman Munzesheimer and Sam Daube, parties of the second part, witnesseth: That for the consideration hereinafter mentioned the party of the first part hereby let unto the parties of the second part for the term of three years, beginning on the date hereof and ending on the 18th day of October, 1897, the following described premises to wit: (Then follows description of premises in controversy). In consideration the parties of the second part have this day paid parties of the first part the sum of $300 cash, the receipt of which is hereby acknowledged, and that said parties of the second part shall have the right to rent said premises at $100 per year as long as present land tenure in the Chickasaw Nation prevails. Whereas, Richard McLish and Lee Cruce claim an interest in the west half of said premises, and said party of the first part are endeavoring to acquire a conveyance from said Richard McLish and Lee Cruce of all their right, title, claim, and interest in and to said premises. It is agreed, in case the said party of the first part acquire a conveyance from the said Richard McLish and Lee Cruce of all their right, title, claim and interest in and to said premises, that in this event the said parties of the second part shall have

the option to rent said premises annually, so long as the present conditions of land tenure prevails in the Chickasaw Nation, upon paying therefor the rental agreed to pay therefor in this contract. This is to say, that the parties of the second part shall have the option to rent said premises from the parties of the first part upon paying therefor the sum of $100 per annum, in case the parties of the first part shall not acquire the conveyance above mentioned from said Richard McLish and Lee Cruce, but, in case the parties of the first part acquire such conveyance from said Richard McLish and Lee Cruce, then this option to rent said premises shall accrue to the parties of the second part upon paying the sum of $212 per annum." This instrument was duly acknowledged on the 31st day of December, 1895.

The answer then alleges that the tenure of lands in the Chickasaw Nation has not changed, and that since the 20th day of October, 1897, they have for each year tendered to plaintiff the sum of $100. The case was tried to a jury, and verdict and judgment for the plaintiffs. The facts in the case will be more fully set out in the opinion.

*Ledbetter* and *Bledsoe*, for appellants.

*W. S. Cruce* and *A. C. Cruce*, for appellees.

CLAYTON, J. (after stating the facts). The testimony introduced at the trial on the part of the plaintiffs tended to show: That there was executed by Mrs. Minnie Thomas, who had title to the premises in controversy, to Munzesheimer & Daube, two contracts of lease. The first was executed by her on the 20th day of October, 1894, during the lifetime of her former husband, McCauley, and signed by both plaintiff and her husband. That by the terms of this instrument the premises were leased for the term of three years without any provision for the future rental of the land, thus making the lease terminate

on the 20th day of October, 1897. That after her then husband's death Mr. Daube came to her home, bringing with him one N. H. McCoy, a notary public, and produced another lease contract —the one set out and relied on by the defendants in their answer—and stated to her that now that her husband had died he desired a new contract with her name alone to it. She was at the time unable to leave her bed on account of sickness, and during the transactions was propped up in bed with pillows. McCoy, the notary, commenced to read to her the instrument, but, when he had read some three or four lines, he was stopped by Daube, who remarked, in substance, that there was no use in reading the contract; that Mrs. McCauley was quite sick and ought not to be worried; that the contract was the same as the old one, to which the plaintiff replied that, if it were true that it was the same as the old one, she would sign it, and, upon being assured that it was, she signed it without reading it or having it read to her, believing that the only change in the instrument from the original was in leaving off the name of her late husband. She testified that had she known that the instrument had a provision giving an option after the expiration of the three-year term, or relating to the claims of McLish and Cruce, she would not have signed it. The plaintiff's testimony relating to the fact that the first contract was really made, and that it contained no provision for an option after the expiration of three years, and that it contained nothing regarding the McLish and Cruce claims, was corroborated by one W. W. Wiggs, a notary public, who took plaintiff's acknowledgment to the first instrument; and her testimony relating to the execution of the second instrument, and the fact that it was not read to her, and that she was told by Daube that its terms were the same as the old one, is corroborated by the witness McCoy, the notary who took her acknowledgment to the second instrument. The only testimony on the part of the defendant tending to show that the first lease had not been executed was

the testimony of Mr. Ledbetter, the receiver who had taken possession of the estate of Munzesheimer & Daube.   He simply said that, when the papers of Munzesheimer & Daube were turned over to him, there was no such instrument as the original contract amongst them, and that he thought all the papers were turned over to him.   No witness was introduced to contradict the plaintiff's testimony as to the fraudulent character of the transactions in the procurement of the second lease.

After the testimony relating to the execution of the two deeds of lease had been taken, the defendants' counsel moved the court to strike out all of it relating to the execution of the first deed, on the ground that the plaintiff had admitted the execution of the later one, and therefore all proof of the first one was irrelevant and immaterial; that not having pleaded the second deed in their complaint or made any allegation of its fraudulent procurement, they could not, in an action of unlawful detainer, be allowed to prove it. The court overruled the motion and an exception was saved.   The instructions of the court fairly left to the jury the question as to whether the second contract was fraudulently procured by defendants' grantor.   If so, they were told that they should find for the plaintiff; if not, they should find for the defendants.   All proper exceptions were saved to this charge.   Upon this branch of the case the question, then, is:   In an action of unlawful detainer, where the plaintiff brings his action on the ground that the terms of a lease by him to the defendant had expired, and the defendant in his answer sets up a later lease, executed by the plaintiff to him, the terms of which have not expired, can the plaintiff, without in some way having pleaded the fraudulent transaction upon which he relies to defeat the later deed, or having procured its cancellation in a Court of Equity, be permitted to offer proof of the fraud?

6

First, it is contended by the appellants that the fraudulent procurement of a deed of lease, in an action of unlawful detainer, can neither be pleaded nor proven; that equity has sole jurisdiction in such matters; and, this action being one at law, courts of law are without jurisdiction to hear and determine any question arising upon the fraudulent procurement of the lease. And in support of this contention the following cases are cited: Dysart vs Enlow (Okl.) 54 Pac. 550; Kellog vs Lewis, 28 Kan. 535; Gale vs Eckart (Mich.) 65 N. W. 274; Paldi vs Paldi (Mich.) 54 N. W. 903; Moran vs Moran (Mich.) 63 N. W. 989; Pickard vs Klein, 56 Mich. 604, 23 N. W. 329; Simons vs Marshall, 3 G. Greene, 502. The first case cited, Dysart vs Enlow, supra., was an action of unlawful detainer. The plaintiff pleaded a verbal lease, the terms of which had expired. The defendant answered: First, a general denial; second, a homestead entry, and exhibited a patent from the United States; and, third, the defendant attacked the plaintiff's title by averring that the plaintiff's title rested on a deed of trust executed by defendant to plaintiff, which was void because it was obtained through certain false and fraudulent representations. As to the issue presented by the first paragraph of the answer, the result, of course, depended upon the proof of the execution of the verbal contract of lease and the expiration of its terms. If the proof showed its execution and termination, the plaintiff would prevail; otherwise not. If the defendant should prevail upon that issue, the other two defenses would be unnecessary. If, however, the proof should establish the lease, then the defendant, by acknowledging his landlord's title by entering under the lease, could not set up an adverse title in himself without first surrendering possession, nor could he deny his landlord's title. As to the deed of trust, he would not be allowed to prove its fraudulent procurement; not because a court of law did-not have jurisdiction over such matters, but because, having entered under the lease, he could not, without

first surrendering possession, dispute his landlord's title. And this is what we understand the court in that case to have decided. If, as claimed by appellants' counsel, that court went further and held that in a case like this, where the right of possession of realty depends upon one of two leases, both executed by the landlord to the tenant, where the title to the land is not in controversy, that the fraudulent procurement of the one or the other cannot be pleaded and proven in a court of law, we beg most respectfully to dissent. The next case cited, Kellog vs Lewis, supra, was an action of unlawful detainer. The complaint alleged a verbal lease and a termination by agreement with the defendant, and also that the lease was forfeited by a violation of its terms on the part of the defendant. On the trial the plaintiff sought to prove that defendant had forfeited his right to possession under the lease by being guilty of waste to the premises, by failing to keep up repairs, etc. This evidence was objected to and objection sustained. The case had originated in a justice court. The Supreme Court of Kansas sustained the holdings of the court below on the ground that a court of law could not declare a forfeiture of a lease for a violation of its conditions before the expiration of its term; that equity only had that jurisdiction; and that the case, having originated in a court of a justice of the peace which had no equity jurisdiction, the District Court on the trial of the case could only exercise the jurisdiction of the justice court. No question of fraud was presented or passed upon in that case, and it nowhere reflects any light on the question being considered here. In Moran vs Moran, supra, which was an action of ejectment, the deed was attacked because of the fact that the grantor was incompetent to contract at the time of its execution. The Supreme Court of Michigan held that, because of that fact, the deed was not absolutely void as for fraud, as it passed the legal title to the grantee, and the contract purchaser could not cause it to inure to himself, except

by showing his equitable right and title as against the grantee; and this showing cannot be made in an action of ejectment. It is undoubtedly the common-law rule that, in an action of ejectment, all defenses which are not legal are excluded, and that an equitable title cannot be set up against a legal one. And Michigan is, or at that time was, one of the few states that adhered to the common-law rule. In the Moran Case that court uses the following language: "Counsel for plaintiff cites a large number of cases from other states, in which deeds of incompetents have been set aside in actions of ejectment. But, as said by this court in Harrett vs Kinney, 44 Mich. 457, 7 N. W. 63: 'The common-law rule which excludes all defenses in ejectment which are not legal has been abrogated in many parts of the Union. * * * And it remains in force in this state.'"

All of the cases cited by counsel for appellants, except Dysart vs Enlow and Kellog vs Lewis, were actions of ejectment, and were tried and decided in states the courts of which still adhered to the strictness in pleading and proof of the old common-law action of ejectment. Under the statute relating to ejectment in force here, all fictitious pleadings are abolished, the real parties in interest must be parties to the suit, and the judgment of the court in the action is conclusive of the title. Although the statute relating to the action of ejectment does not in words say that the judgment shall be conclusive of the title, yet the Supreme Court of the United States, in Sturdy vs Jackaway, 4 Wall. 174, 18 L. Ed. 387, decided, in passing on our statute of ejectment: "A final judgment pronounced in an action of ejectment, where the claim of title in fee simple absolute by the parties, respectively, was the sole subject of controversy, instituted and prosecuted under and according to the forms and in the manner prescribed by the statute laws of the state of Arkansas—that is to say, by a suit between

the real litigants by name—and where the land is accurately described, is a valid legal bar to a like action subsequently instituted between the same parties for the same lands or premises, involving the same identical title and rights to the possession of such lands or premises, and none other." And, where such is the law, there is no more sanctity surrounding an action for land-or its possession than in other cases; and, wherever fraud may in other actions be set up in a court of law to defeat recovery, so may it be set up and relied on in an action of ejectment or other actions relating to land.

In the case of Blanchard vs Brown, 70 U. S. 245, 18 L. Ed. 69, a case which went to the Supreme Court of the United States from the Circuit Court of the Northern District of Illinois, the court say: "Various judgments had been given against a debtor in Chicago owning real estate there, among them one in favor of Lyman. Execution issued in April, 1847, and on it, in April, 1848, the premises were sold to Blanchard. A certain Hart had also obtained judgment against the same party. Execution issued in 1845, but was not returned into the clerk's office until 1852. The execution, it seemed, recited a judgment of the Cook county court of common pleas, a court not at the time in existence, that court having been created by act of Legislature only in 1848, and the name of the court in which the judgment was really given, to wit, the 'Cook County Court,' having in that act been changed to it. An alias was subsequently issued on the same judgment, and the land sold for $71 to Brown; its actual value at the time being about $2,000, or, as was alleged, $4,000. Blanchard being in possession, Brown brought ejectment against him. Both parties, of course, claimed under the same judgment debtor, and by virtue of their respective judgments and execution sales; the judgment under which Blanchard claimed being junior to the one on which Brown rested his title, and judg-

ments being liens in Illinois according to their priority.   Blanchard set up as his ground of defense on this ejectment that the sale under the judgment in favor of Hart, and under which Brown sought to dispossess him, was a fraudulent sale, made to defeat subsequent incumbrancers, and accordingly that Brown had no title.   To show the fraud, evidence was given of the value of the property compared with the price for which it sold; that it was sold in a body, instead of having been sold, as it might naturally and much more profitably have been, in a divided form; that false representations were made as to the incumbrances on it, the representations having been that it was largely incumbered when it was not so; that no proper notice of sale had been given, the advertisement which gave the notice having announced only that the same would be on a day named, 'between 9 o'clock a. m. and sunset.' " 'The verdict was for Brown.   In deciding the case the Supreme Court of the United States say:   "The common-law form of the action of ejectment does not prevail in Illinois.   There the action is without fictions, and is between the real parties in interest, and for the possession of a specific estate, and damage for its detention.   On account of the fictitious character of the common-law action of ejectment, a judgment was not a complete bar, as in other actions.   But in Illinois, by statute, it is declared, 'that every judgment in the action of ejectment, rendered upon a verdict, shall be conclusive as to the title established, in such action, upon the party against whom the same is rendered, and all persons claiming from, through or under such party, by title accruing after the commencement of such action.'   One verdict alone was not deemed satisfactory by the Legislature.   The ancient reverence for the tenure by which lands are held had its influence, and the unsuccessful party, of right, is entitled to one new trial, and the court can, if satisfied that justice will thereby be promoted, grant a second. After this the litigation is ended, and the verdict and judgement

have the same conclusive effect as in other actions.    In Missouri
a judgment in ejectment is also a bar to any other action between
the same parties on the same subject-matter; and this court,
in the case of Miles vs Caldwell, 2 Wall. 44, 17 L. Ed. 755, in
construing a statute no broader than the Illinois enactment,
held that whatever is conclusive of the title to land in the courts
of a state, is equally conclusive in the Federal Courts; that it is,
in fact, a rule of property.    A perfect solution is, therefore,
given to this case when it is ascertained what was tried and
determined in the ejectment suit.    The evidence on this point
is so full as to leave no room for doubt.    Blanchard did not
resist Brown's recovery in the action of ejectment on the sole
question of paramount legal title, which he had the right to do,
and then endeavor to get rid of it in chancery on the question
of superior equities.    He chose rather to risk his whole defense
in the impeachment of Brown's title for fraud, and because the
sale was vitiated by irregularities and the property sacrificed.
Having failed before the jury, he is estopped from investigating
the same matters in another jurisdiction.    He waived his right
to have the question of fraud litigated in a Court of Chancery,
when he presented it, as a defense to the action of law.    And
the defense was legitimate and proper, for such questions of
fraud and irregularity as were raised could be disposed of as well
at law as in chancery."

Miles vs Caldwell, 69 U. S. 35, 17 L. Ed. 755, cited in
Blanchard vs Brown, was a bill in equity to quiet title to land
which in a previous action of ejectment had been adjudged
to the defendant, Caldwell.    In the ejectment suit Miles, who
was the plaintiff, claimed under a mortgage.    The defendant,
Caldwell, without pleading fraud, offered proof before the jury
to the effect that the mortgage of Miles was bad, as having
been made in fraud of creditors.    Miles offered proof that his
mortgage was not fraudulent, but was given for a valid debt.

And this issue was presented to and passed upon by the jury resulting in a verdict for the plaintiff, Miles. The Supreme Court held that even though fraud was not specially pleaded, and notwithstanding the fact that it was an action of eject-ment, the proof was properly admitted, and that the judgment was valid and a finality upon the question of title and right of possession, and reversed the decree of the Circuit Court in the suit in equity, with directions to dismiss the bill. In deciding the case the Supreme Court, among other things, say: "Re-verting now to the question of policy, grounded on the supposed sanctity of land titles as affecting the conclusiveness of judg-ments in trespass or ejectment, we remark that it is the settled doctrine of this court, in reference to all questions affecting the title to real estate, to permit the different states of the Union to settle them each for itself; and, when the point involved is one which becomes a rule of property, we follow the decisions of the state courts, whether founded on the statutes of the states or their views of general policy. As regards the par-ticular question before us, there is a great difference in the different states in the value attached to real estate, and to the title by which it is held, as compared with other species of property. But no doubt is entertained that in all of them the feeling is far removed from that which formerly prevailed in England, or which prevails there even now. While some of our older states still uphold many of the safeguards of the common law, with its complicated system of conveyancing, operating as a strong drag upon the facility and frequency of transfers of real property, our Western people traffic in land as they do in horses or merchandise, and sell a quarter section of land as readily and as easily as they do a mule or a wagon. The laws of the people correspond with their habits. Deeds of conveyance are by statute rendered exceedingly simple and effectual, the main safeguard being a well-digested system of registration. In consonance with this general facility of traffic,

it is their policy to prevent those endless litigations concerning titles to lands which in other countries are transmitted from one generation to another. The rapid settlement of a new country requires that a title once fairly determined shall not be again disturbed as between the same parties."

Our practice and pleading in ejectment, as well as all other forms of action, is under the Arkansas statute. By that we are bound. And as has been shown, under the statute ejectment is stripped of all the fictions of the common-law actions. The persons in interest must be the real parties to the suit, and the judgment is a finality. We are in exact line with those states which have adopted the modern forms so often mentioned by the Supreme Court of the United States, as well as of the various states. in their decisions. Now, upon the matter before us, it stands upon the same footing as other actions, and, whatever may be set up in a court of law as to fraudulent procurement if an instrument of writing in one, may be set up in the other. And therefore, if it be true that the statutory action of unlawful detainer is analogous to ejectment, and must be governed by the same rules, as is contended for by counsel for appellants, under the rules as they now exist in many of the states, and certainly within this jurisdiction, fraud may be pleaded and proven in both.

That fraud in the execution of a deed or other instrument of writing may be pleaded and tried at law as well as in equity is now so firmly ingrafted upon the law as to need no citation of authorities. Mr. Newell, in his work on Ejectment (section 10), speaking of this subject as it applies to an action of ejectment, says: "The rule is familiar, wherever the distinction between law and equity is preserved, that in a trial at law fraud in the execution of a deed may be given in evidence, as that, through misreading, or the substitution of one paper for another,

or by other device or trickery, he was induced to execute it, believing at the time that he was executing something else; and it may also be proven that what purports to be a deed is in truth not a deed, but a forged instrument." And the proof, from the necessity of the case, must generally be oral. In the case of Insurance Company vs Wilkinson, 13 Wall. 231, 20 L. Ed. 617, Mr. Justice Miller, speaking for the court, says: "The defendant excepted to the introduction of the oral testimony regarding the action of the agent, and to the instructions of the court on that subject; and assigns the ruling of the court as error on the ground that it permitted the written contract to be contradicted and varied by parol testimony. The great value of the rule of evidence here invoked cannot be easily overestimated. As a means of protecting those who are honest accurate, and prudent in making their contracts against fraud and false swearing, against carelessness and inaccuracy, by furnishing evidence of what was intended by the parties, which can always be produced without fear of change or liability to misconstruction, the rule merits the eulogies it has received. But experience has shown that in reference to these very matters the rule is not perfect. The written instrument does not always represent the intention of both parties, and sometimes it fails to do so as to either; and, where this has been the result of accident, or mistake, or fraud, the principle has been long recognized that under proper circumstances, and in an appropriate proceeding, the instrument may be set aside or reformed as best suits the purposes of justice. A rule of evidence, adopted by the courts as a protection against fraud and false swearing, would, as was said in regard to the analogous rule known as the statute of frauds, become the instrument of the very fraud it was intended to prevent, if there did not exist some authority to correct the universality of its application. It is upon this principle that courts of equity proceed in giving the relief just indicated; and though the courts, in a common-law action

may be more circumscribed in the freedom with which they inquire into the origin of written agreements, such an inquiry is not always forbidden by the mere fact that the party's name has been signed to the writing offered in evidence against him. In the case before us a paper is offered in evidence against the plaintiff, containing a representation concerning a matter material to the contract on which the suit is brought, and it is not denied that he signed the instrument, and that the representation is untrue. But the parol testimony makes it clear beyond a question, that this party did not intend to make that representation when he signed the paper, and did not know he was doing so, and in fact had refused to make any statement on that subject. * * * It is precisely in such cases as this that courts of law in modern times have introduced the doctrine of equitable estoppels, or, as it is sometimes called, estoppels in pais. The principle is that, where one party has by his representation or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." The oral proof, produced in this case to show that the deed of release relied on by the defendant was procured by fraud, was not offered for the purpose of changing or varying the contract between the parties, but to show that, because of the fraudulent representations made at its execution, it evidenced no contract at all; that it was void.

No principle of the law is more firmly ingrafted upon our jurisprudence, than that fraud in the execution of an instrument renders it absolutely void as to the party guilty of the fraud, and that it is available to him for no purpose; and that courts at law have concurrent jurisdiction with courts of equity to prevent its use as evidence, thereby preventing the fraudulent party from obtaining any advantage by it.

But this is an action of unlawful detainer. Before its enactment ejectment was the remedy to obtain possession of land from a tenant holding over after the expiration of his term; and for the very purpose of getting away from the technicalities; of that action, and the fact that judgment in the action was not a finality, the Legislature provided the more simple, speedy, and effective remedy of unlawful detainer. But if we are to hold that one is analogous to the other, and surround unlawful detainer with all of the technical difficulties of the old, and almost obsolete, common-law ejectment, what good has been accomplished by the Legislature? Would we not nullify the purpose of the enactment and the will of the Legislature?

We hold that a fraudulent execution of a deed of lease may be shown by oral proof in an action of unlawful detainer. In this case the plaintiff pleaded her original lease, expiration of the term, and demand for possession. The defendants, by their answer, pleaded a subsequent lease, executed to their grantor by the plaintiff, the deed shown to have been fraudulently executed. There were other matters pleaded, but the case was tried and decided upon the issues as above set forth. There was no allegation of fraud set up, either in the complaint or answer, as to the issue upon wuich the case was tried.

It is contended that, as the plaintiffs did not allege fraud, they should not have been allowed to prove it. Section 5022, Mansfield's Dig. (Ind. Ter. Ann. St. 1899, § 3227), provides: "The only pleadings allowed are: First. The complaint by the plaintiff. Second. The demurrer, or answer, by the defendant. Third. The demurrer, or reply, by the plaintiff." Section 5025 (section 3230) provides: "An issue of law arises: First. Upon a demurrer to the complaint, answer or reply, or to some part thereof. An issue of fact arises: First. Upon a material allegation in the complaint denied by the answer.

Second. Upon a set-off or counter-claim presented in the answer, and denied by the reply. Third. Upon material new matter in the answer or reply, which shall be considered as controverted by the opposite party without further pleading." Section 5043 (section 3248) provides: "There shall be no reply, except upon the allegation of a counterclaim or set-off in the answer."

Under the common-law pleadings all new matter properly pleaded set up in the answer should be met by a replication. Under that system of pleading, it would have been incumbent on the plaintiff in this suit to have filed his replication setting up the facts which rendered the deed void. But under our law of pleading and practice this cannot be done, because it is neither a set-off nor a counterclaim; and, unless these are averred, the pleadings stop with the answer. It was never intended by this abbreviation of the pleadings, that the plaintiff should be cut off from defending against new matter pleaded in the answer. Every new matter set up in the answer, except it be a counterclaim or set-off, which the plaintiff could have replied to by his replication by the old system, he may now reply to by his proof. The plaintiff pleads a deed of lease. The defendant pleads a subsequent deed of lease. The pleadings can go no further; but the law steps in and denies for the plaintiff the new lease—that is, that any valid lease other than the first was executed by plaintiff. And, as the plaintiff is cut off from pleading the facts which render the deed void, he may prove them. And this does not deprive the defendant of any right to plead or have advantage of any new matter, which he could have set up in his answer under the old system of pleadings. The only difference is that then the particular ground of defense upon his new matter would have been specifically pointed out by the replication, and all other matters proper to reply to would have been taken as confessed; but the defendant, except as to set-off and counterclaim, must now come

into court prepared to defend his new matter by proof upon every ground of legal attack. In Miles vs Caldwell, supra, which was an action of ejectment, the defendant offered proof that the mortgage set up by plaintiff in the complaint as the title upon which he relied was void, as having been made in fraud of creditors, and the plaintiff offered proof that the mortgage upon which the defendant relied had been satisfied; but neither of these points were put in issue by the pleadings, and the Supreme Court of the United States held that the proof as to both was properly admitted.

In this case we are of the opinion that the proof of the fraudulent execution of the deed of lease set up in the answer was properly admitted in the trial of the case. The charge of the court fairly submitted the case to the jury upon the question of the fraudulent character of the second lease. There was ample proof to justify the submission of the question to the jury.

Finding no error in the trial of the case, the judgment of the court below is affirmed.

GILL, J., concurs. RAYMOND, C. J., not participating.