144 So. 367

## SOUTHERN BUILDING & LOAN ASS'N v. BRYANT.

8 Div. 428.

Supreme Court of Alabama.

Oct. 6, 1932.

Rehearing Denied Nov. 3, 1932.

Julian Harris and A. J. Harris, both of Decatur, for appellee.

Lange, Simpson & Brantley, of Birmingham, for appellant.

THOMAS, J.

The count was one on the case claiming $3,-000 for deceit in the sale to plaintiff on the 4th day of February, 1929, of a "surplus certificate," issued by the defendant, a building and loan association. It is charged that an agent of the defendant on the sale made representations to the effect that plaintiff was purchasing stock which had a value of $250, and which bore interest at the rate of 8 per cent., on which plaintiff could at any time withdraw his $250, with interest; that these representations were false and were willfully made and knowingly false; that the surplus certificate had no market value, and under the rules and by-laws of the defendant it did not bear any interest, and had no value other than a remote future possibility. The count claims the damages sustained by plaintiff, together with punitive damages for the deceit.

The defendant demurred and thereby challenged the sufficiency of the averments and the representations to constitute fraud, and also the sufficiency of the averments to apprise the defendant of the character and extent of the misrepresentations; whether misrepresentations of the terms of the contract, or whether a promise to do a future act. It is urged by demurrers that it appears on the face of the count the defendant was at the time a building and loan association, a corporation with shareholders and members, and that plaintiff, being a member and shareholder and electing to remain a member and shareholder, could not sue the defendant for damages for a deceit in the sale of the shares of stock. The demurrer was overruled.

Defendant thereupon filed pleas 1 and 2 of the general issue; pleas 3 and 4 of the statute of limitations of one year; pleas of recoupment A and B; and plea of set-off C.

Pleas A, B, and C were amended, and to each of the pleas as amended plaintiff filed a demurrer.

Each of the last-indicated special pleas sets up the contract by virtue of which plaintiff purchased the stock or certificate as alleged in the complaint; avers that plaintiff entered into a contract for the purchase of 50 units of stock of the par value of $100 per unit, and agreed to pay $250 cash and $25 per month until the entire purchase price of $5,000 should be paid; purports to set up the nonpayment of the purchase price of the stock; and claims $475 as the amount due defendant at the time of the filing of the complaint. Each of said pleas avers a written contract was signed by plaintiff at the time, and pleas A and B aver that the contract described is the same transaction as that described in the plaintiff's complaint. Plaintiff's demurrer to each of the pleas, A, B, and C as amended, was sustained, whereupon the plaintiff filed replications 1, 2, and 3 to each of the defendant's pleas 3 and 4 of the statute of limitations, viz., the first replication joined issue. Defendant's demurrer to replication 2 was sustained, and therefore is not considered on this appeal. Replication 3 set out that the suit was brought by the plaintiff within one year after the fraud alleged in the complaint was discovered by the plaintiff, which was, to wit, January, 1930, and the defendant's demurrer to this replication was overruled. Grounds 5, 6, and 7 of this demurrer raised the point that the circumstances and the manner under and in which plaintiff discovered the fraud are not set out.

█ It is declared by the decisions, that one induced by fraud to contract has an election of remedies: (1) To rescind and sue for his money back, when he has restored the benefits received, then only may he recover the payments made; or (2) he may affirm the contract, retain its benefits, and sue for the deceit and damages accruing to him (Day v. Broyles, 222 Ala. 508, 133 So. 269; Coleman v. Night Commander Lighting Co., 218 Ala. 196, 118 So. 377; Chandler v. Wilder, 215 Ala. 209, 110 So. 306; Gulf Electric Co. v. Fried, 218 Ala. 684, 119 So. 685; Fairbanks, Morse & Co. v. Dees, 220 Ala. 41, 126 So. 624; Southern Building & Loan Association v. Wales, 224 Ala. 40, 138 So. 556); or (3) the party defrauded, under appropriate facts, when sued by the party who perpetrated the fraud, may defeat such action at law by an appropriate plea setting up the facts amounting to the fraud that induced that defendant to enter into the contract, by way of recoupment or setoff or estoppel, as the case may be (13 C. J. 395, §§ 304, 306; 14 C. J. 589, § 864; Sass v. Thomas, 6 Ind. T. 60, 89 S. W. 656, 11 L. R. A. (N. S.) 260; 6 R. C. L. p. 636, § 52; Thompson v. Fourth Nat. Bank, 214 Ala. 452, 456, 108 So. 69; Prestwood v. Carlton, 162 Ala.

327, 339, 50 So. 254; Lowery v. Mutual Loan Soc., 202 Ala. 51, 79 So. 389; Grissom v. J. B. Colt & Co., 218 Ala. 336, 118 So. 580); (4) that the measure of actual damages in such suit is the difference between the value of the shares at the time of discovery of fraud and the purchase price, or the value the article would have had, if it passed the qualities represented and within the contemplation of the parties, with interest (Southern Building & Loan Association v. Wales, supra; C. D. Chapman & Co. v. G. P. Dowling Hardware Co., 205 Ala. 586, 88 So. 748; Attalla Oil & Fertilizer Co. v. Goddard, 207 Ala. 287, 92 So. 794; Grissom v. J. B. Colt & Co., supra; Ewart v. Cunningham, 219 Ala. 399, 122 So. 359; Hogan v. Thorington, 8 Port. 428; Maxwell v. Sherman, 172 Ala. 626, 55 So. 520; Preston Motors Corporation v. Wood, 208 Ala. 172, 94 So. 70; Kilby Locomotive & Mach. Works v. D. B. Lacey & Son, 12 Ala. App. 464, 67 So. 754, and authorities; King v. Livingston Mfg. Co., 192 Ala. 269, 68 So. 897; Caffey v. Alabama Mach. & Supply Co., 19 Ala. App. 189, 96 So. 454; Robinson v. Steverson, 20 Ala. App. 59, 100 So. 910); (5) that punitive damages may not be recovered in such an action (deceit) unless the fraud is gross, malicious, oppressive, and committed with an intention to so injure and defraud. (Caffey v. Alabama Mach. & Supply Co., 19 Ala. App. 189, 96 So. 454, 457; Ex parte Alabama Machinery & Supply Co., 209 Ala. 466, 96 So. 459; Alabama Mach. & Supply Co. v. Caffey, 213 Ala. 260, 262, 104 So. 509; 24 C. J. 104, § 265).

█ It is unnecessary to observe that when the action is deceit, and therefore a ratification of the contract, the defendant may recoup any sum due the defendant under the contract. That is, the defendant is entitled to his damages on the basis of the performance of the contract. § 10180, Code; Preston Motors Corp. v. Wood, 208 Ala. 172, 94 So. 70; Moore v. Oneonta Motor Co., 223 Ala. 510, 137 So. 301; Fairbanks, Morse & Co. v. Dees, 220 Ala. 41, 126 So. 624; Lowery v. Mutual Loan Soc., 202 Ala. 51, 79 So. 389; Grissom v. J. B. Colt & Co., 218 Ala. 336, 118 So. 580; McCready v. Phillips, 56 Neb. 446, 76 N. W. 885.

Since writing the above there has been a decision by the other division of Southern Building & Loan Association v. Dinsmore (Ala. Sup.) 144 So. 21.[1] This case is ruled, in respect to the ruling on demurrer to the pleas and in all other respects, except as now to be considered, by that recent decision by Mr. Justice Gardner.

A further consideration is necessary as to the refusal of the affirmative charge requested in writing by the defendant, and the motion for a new trial, and its ground that the verdict was excessive.

[1] Ante, p. 550.

The witness Bryant testified in his own behalf that defendant's agent talked with him three .times about the sale, which was consummated about February 2, 1929, and a receipt given for the check of plaintiff for $250; that the "surplus certificate and a little book" were delivered to him at a later date; about February 4th. The witness said that he paid him (Mr. Abbott) the $250 "for units—$5.00 a unit. He said he could not sell me over five hundred, or five hundred dollars worth, and I bought $250.00 worth of Southern Building & Loan Stock. He told me it was $5.00 a unit, and said I could buy as little, but I could not buy over $500.00 worth from him; said that was as much as he was allowed to sell of the stock. He told me that it would give me 8% twice a year, 4%—that would be every six months; that the stock would grow, and he would guarantee me that much, and the growth of it would make it double inside, he said, not over three years, but said two and a half years the growth would double; and he said also any day you want your money, all you got to do is to send in your pass book. He had another book looked like the one, but I never looked at it, and said: 'I will give you that and any day you want your money, you can send that in to the office and get it just the same as you can down there at the Tennessee Valley Bank.' * * * On the third trip he said: 'Here's your certificate,' and he gave me another little sheet about like that receipt and said, 'You can sign this and send it into the Company if you want to and give them a right to vote any way they want to, and it is not binding, you don't have to if you don't want to.' Nothing else was said. He was in an awful hurry the morning he brought me the certificate and book, and when he started off, I said to him: 'This interest, if I don't happen to need it at the time it is due, can I get more stock to finish out $500.00?' He said: 'You can't buy any more stock.' I don't recall signing the card. He handed me the card and put it on a bill fold and reached it over to me and says, 'Here is an identification card that we want to keep in the office with your name.' That was after I gave him the check and he wrote me the receipt. He said it is just like an identification card at the Bank. He wanted my signature, and I signed it. I did not read it over, and didn't see anything on it to read. I tried to get my $250.00 back at the office of the Southern Building & Loan at Birmingham, long before the year was out."

It is not disputed that Abbott sold the stock to appellee on the statement that he could withdraw his money at any time. Witness (Bryant) further testified that he went to Birmingham in January, 1930, and asked them: " 'What is mine worth?' The man at the window, he said: 'My friend, it is worth about as much as the button on your coat to you,' and I says 'It is costing me $25.00. It was my un-derstanding that I could draw it out and get 8% interest on it.' They did not offer to pay me anything on it, and I have never got anything on it, and never have been back. I had not learned before that, that the money was not withdrawable. This was the first time I knew it wasn't any good to me. Mr. Abbott told me the stock was $5.00 a unit, and he receipted me for $100 units."

The certificate that was delivered with the pass book certified, among other things:

"Incorporated under the laws of Alabama.

"Southern Building & Loan Association Birmingham, Alabama.

"Number 2809 50—Units

"4 This is to certify that J. J. Bryant has subscribed for fifty units of the full participating Capital Stock of the Southern Building & Loan Association, and has paid into the Association, in accordance with and for the purposes set forth in the by-laws of said Association, the sum of ($250.00)—Two Hundred Fifty Dollars.

"The legal holder of this Surplus Certificate, at such time as his proportionate share in the Surplus Fund of the Association, as defined in the by-laws, shall be equal to the amount represented hereby, 'shall, upon the surrender of this certificate, be entitled (1) to have the amount represented hereby credited on his pass book, or (2) to convert same into an equal amount of any class of stock at such time being issued by the Association, or (3) to withdraw the amount represented hereby in accordance with the provisions of the by-laws."

Witness further testified he did not read the certificate when delivered, and "never saw any (of the) by-laws of the Association," but asked to see them when he was in Birmingham (that was in January, 1930), and they "failed to let" him have them. On cross-examination that witness testified he "made no further investigation, and talked to no one else" about the transaction; that about a week after the purchase of the certificate he received the same; that Abbott told him that whenever he gave me that "book just like the Bank gives a man a book when he deposited any money, and whenever you want to draw out any of your money, send the book in, and if you want the interest put on this book, sent it in and let them. He didn't explain that the book was for the purpose of entering up deposits. I didn't understand that I had signed a contract whereby I could deposit money in the company. I understood that I could put in nothing more than to finish out to buy $500.00 in stock. He said that was the limit. He told me that that was the limit of the stock that was paying 8% and he would. get out 6% later on. He said this money will draw you 8% now, but the next will be 6%.

He told me a unit was $5.00 and that 100 made $50.00, [$500.00] and that was as much as he was allowed to sell. Beasley was there when he told me this. He said nothing about me having the right to pay as much as $5000.00 if I wanted to. * * * He did not explain to me that the money on the surplus certificate was not withdrawable' at my wish. The only thing he told me about depositing the money was that he brought me my certificate and book, and I said 'If I don't need the interest, can't I go ahead and buy more stock with it until I get my $500.00 worth of stock?' And he said: 'No, the thing for you to do is to put that on deposit,' what I will be allowed out of the stock on—8% stock. He told me the building and loan business was a sort of business you could not lose in. He said they put up their money on first mortgages on real estate, and there is not a way for you to lose a dollar in it. * * * I went down to see them along in January or the latter part of 1929. It was after Christmas. I had nothing to do with the Company from the time I bought the stock until I went to Birmingham. I went to Birmingham and had a conversation with this man, but I don't know who he was. I had never seen him before. He said he was working for the Company. I, first talked to him at the office door—the window at the office—and then he called us around in a sitting room and in a corner like. This was after Christmas and I think in January 1930." (Italics supplied.)

The suit was brought on September 5, 1930.

The matter on the subscription card and the conditions and terms of the by-laws were not indicated to plaintiff. The indorsement on the bottom of the surplus certificate, "Unit $100.00 par value," did not sufficiently inform appellee that he had been defrauded; this was not the misrepresentation charged—that he was buying stock of the value of $250 bearing legal interest rate and withdrawable at the will of the purchaser.

 The certificate, if such as to inform purchasers on inspection that it could be withdrawn when plaintiff's interest in the surplus fund, *as defined by the by-laws*, equaled the amount represented by the certificate,' or $250, considered when read with the by-laws and with the assurance of Abbott's representation that it was withdrawable at any time, would afford a reasonable inference by purchasers that said shares or certificate had interest surplus equal to the amount represented by the certificate, and therefore the mere inspection of the certificate was not notice to plaintiff of the fraud.

 The matter that gave plaintiff his cause of action was his belief and action on Abbott's representation and parting with his money; and, having so believed and acted in good faith on the misrepresentation made him, he was not disillusioned by the recital of the certificate in the absence of the by-laws. He had the right to rely on the representation and belief that it was in accordance with the rights represented and to be guaranteed to him by the by-laws. A jury question was presented and affirmative instruction requested properly refused under our rules. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135.

 the facts, if any, would have put an ordinarily prudent person on notice of the fraud was a jury question. It is not contended that he discovered the fraud until he sought to withdraw in Birmingham. Jones v. Coan, 146 Ala. 659, 41 So. 757; Duncan v. Watson, 198 Ala. 180, 73 So. 448; Kilby Locomotive & Mach. Works v. Lacey & Son, 12 Ala. App. 464, 472, 67 So. 754.

We have likewise considered the motion as to whether punitive damages should be awarded and whether those imposed were excessive. We are of opinion that the verdict should not be disturbed.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

