13 So.2d 679

### SIMON v. GOODMAN.
#### 6 Div. 55.

Supreme Court of Alabama.
May 20, 1943.

Rehearing Denied June 10, 1943.

Taylor, Higgins & Windham and J. Howard Perdue, Jr., all of Birmingham, for appellant.

Lange, Simpson, Brantley & Robinson, of Birmingham, for appellee.

THOMAS, Justice.

The question presented by the appeal is the giving at defendant's request the general affirmative charge as to the wanton count.

There are many decisions by this court, touching the question presented for decision, not necessary to cite. Typical cases of wantonness, supported by a scintilla of evidence are: Lambert v. Birmingham Electric Co., ante, p. 333, 13 So.2d 579; Birmingham Railway, Light & Power Co. v. Jung, 161 Ala. 461, 475, 49 So. 434, 18 Ann.Cas. 557; Birmingham Electric Co. v. Mann, 226 Ala. 379, 147 So. 165; Dozier v. Woods, 190 Ala. 279, 67 So. 283; Duke v. Gaines, 224 Ala. 519, 140 So. 600 (defining wantonness); First National Bank v. Sanders, 227 Ala. 313, 149 So. 848.

A typical decision to the effect that on such tendency of evidence the court was not authorized to exclude the issue from the jury is Daniel v. Motes, 228 Ala. 454, 153 So. 727, 728, where wantonness is illustrated as follows: "Stating the rule applicable to a case of this character, we hold that if A drives his car down the center of the road, and meets B, driving his car well on his side of the road, and A, in violation of the law of the road, refuses to turn to the right, and keeps straight ahead with the view of forcing B still further out on his side for fear of a collision, but B continues in the zone he has the right to be, and thus a collision becomes so imminent that it is too late for A to turn to the right and avoid it, A may be guilty of a wanton wrong. Though he may not intend a collision, if he knowingly and wrongfully brings on a condition of danger, taking a chance on the other fellow giving way to his wrongful course, until too late for preventive effort, such conduct has all the elements of a wanton act."

In Jack Cole, Inc., v. Walker, 240 Ala. 683, 200 So. 768, 771, Mr. Justice Knight said for the court: " * * * in determining whether the affirmative charge should have been given for defendant, we must look to the strongest tendencies of the evidence for plaintiff. Godfrey v. Vinson, 215 Ala. 166, 110 So. 13. The evidence tended to show that plaintiff's intestate, at the time he was struck by defendant's truck, was crossing over court square, and was between the Fountain and Liggett's Drug Store; that he was walking between the 'white lines' designated as the walkway for pedestrians; that defendant's said truck was crossing Court Square, and being driven at a rate of speed of 35 miles per hour at the time of the accident; that the driver of the truck kept no lookout for persons on the walkway to which he was fast approaching, and from which he was but a short distance; that the defendant's driver knew (he so testified) that Court Square was one of the most popular streets or thoroughfares in the City of Montgomery, and that there is always a large amount of traffic at that point. * * *"

424

■ From the foregoing decisions we observe that each case is bound by its material facts; that before it can be said an act or failure to act is wantonly done or omitted and an injury resulting thereby is wantonly inflicted, it must be shown that the party charged with committing the wrong or omitting to reasonably act in that behalf, had knowledge of the danger, present or impending, to the other party or parties so situated, and being conscious (from his knowledge of existing conditions and impending danger) an injury would likely or probably result from his conduct or omission to act, with reckless indifference to consequences, consciously and intentionally did the wrongful act, or omitted to do or discharge the known duty in the premises to avert such danger, and which produced the injurious result. Birmingham Electric Co. v. Turner, 241 Ala. 66, 1 So.2d 299; Alabama Power Co. v. Dunlap, 240 Ala. 568, 200 So. 617; Feore v. Trammel, 212 Ala. 325, 102 So. 529; Shepard v. Louisville & N. R. Co., 200 Ala. 524, 76 So. 850.

■ The first witness for the plaintiff was Joe Hannah, who testified that his attention was attracted by the screams of plaintiff, who was down on the pavement in front of the car that Mrs. Goodman was driving; that her body was within three feet of the wall on the north side of the alley and two or three feet in front of the automobile; that there was a tan mark similar to where a shoe had been scrubbed on the pavement near the body of Mrs. Simon.

On cross-examination this witness testified further as follows: "* * * There is a loading area adjacent to and at the back of the Hill Store where I worked, and there was a truck parked in that area which we had just finished unloading. That truck was in charge of Haynes. I was standing there talking to Haynes after we had finished unloading and was, in a way, facing Nineteenth Street, and all that was occurring there was back of me. * * * I had seen some boys standing in the back door of the other Hill store and they were throwing some kind of bread around there in the alley. I would not say I had seen them throw bread directly at other cars. I noticed the boys when they came out of the store. I did not see the boys any more after the lady hollered. I would not be sure the boys were standing there when the accident happened, but they were there just a moment before it happened. I do not know whether those boys were pelting this lady with bread, or not, there (meaning the appellee). * * *"

The second witness was the plaintiff who testified that

"* * * While walking down the alleyway on the northerly side, which would be my right hand side, I walked in a straight line right near the wall of the Hill store on the north side of the alley. I walked in a straight line all the way down until the time that I was hit by the defendant's automobile. I was close to the Hill's store on the north side of the alley all the way down, so close that my pocketbook touched the side of the building at some points. At the time the appellee's automobile struck me I was so close to the building that my arm struck a door that is to the side entrance to the Hill store on the northerly side of the alley.

"There were some boys in the alley near the entrance to the alley near Twentieth Street and I had walked past them and had walked practically to the end of the building of the Hill store. The boys were near the Twentieth Street entrance. * * * I did not see any boys throw any bread at any automobiles or any one. * * * The automobile driven by the appellee was headed in the same direction that I was and hit me from the back knocking me down and severely injuring me.

"* * * I was walking up close to the wall because my right arm was cut. I was walking so close to the wall I was touching it. That was before the accident. * * * I never changed my way of walking at all. * * * I was looking forward.

"I didn't hear the automobile coming. All I heard was somebody said, 'Damn, you have got the woman,' and before he finished his voice I was down on the ground. * * *

"I do not know how fast Mrs. Goodman's automobile was going, and I do not know whether Mrs. Goodman was looking forward or where she was looking or how quickly she put on her brakes."

Pertinent parts of the testimony of R. L. Haynes are:

"I am employed by the Hill Grocery Company as a truck driver, and on the day of the accident I was in back of the south Hill's store. The appellee's automobile was traveling in a westerly direction, the automobile having entered off of Twentieth

Street which would be the front of the stores. There were some automobiles parked on the south side of the alley, but I do not remember any vehicles being on the north side of the alley where the appellant and appellee were traveling. The appellant was walking close to the building on the northerly side of the alleyway approximately three feet from the building. The appellee's automobile stopped when she struck the appellant. * * * I could not say definitely whether she slowed down or changed her speed before she actually touched the plaintiff. * * * When the automobile hit the plaintiff it stopped as if it had hit a wall. The plaintiff was walking about two and one-half to three feet from the northerly wall of the building and the marks made on the pavement by appellant's shoe were approximately three feet from the wall after the accident; * * * that was where the right front wheel had caught her foot under the wheel. * * * Plaintiff's feet were caught under the right front wheel of the automobile and she jerked loose as she fell.

"During the time that I saw the plaintiff previous to the accident she was within two and one-half to three feet of the right edge or the northerly edge of the alleyway walking in a straight line although she did vary her straight line approximately six inches when she went around some boys in the alley.

"I do not recall hearing any horn blow. There is a whole lot of traffic there. * * * People are walking up and down the alley there going in and coming out of the store on both sides of it."

Mrs. Ruth Goodman, the defendant-appellee, testified substantially as follows:

That she was driving the automobile when this mishap occurred. "I was driving a 1937 Chevrolet; it was in good order, equipped with brakes that worked properly. As I first came into the alley there approaching the point where the accident occurred, I had to stop and change gears when I crossed the sidewalk. I would say that I was driving about ten miles an hour as I came down the alley approaching the point where the accident occurred; * * *.

"There were some automobiles parked on the South Side of the alley, that is, toward the Hill store that is down toward Five Points; I was driving in between the parked cars and the building over to my right there. There were some boys coming toward me as I entered the alley. They did not give any warning, nor did I know that they were going to play any prank on me by throwing at me or molesting me in any way, but they threw rolls or something at me. I did not have any warning that they were going to do this.

"These boys scattered around the car; some went to the right and some to the left before the accident occurred; I do not remember how many went to the right or how many to the left. Just as these boys got out of my way, I saw the plaintiff right in front of my car. As soon as I saw her I tried to stop. She was about as far from me as to the court reporter here when she came in my view, or maybe a little bit further; I do not know exactly how far it was, but it was quite close.

"I applied my brakes as quickly and as hard as I could; I did not run over her that I knew about. I did not have to back my car off of her in order for her to be lifted up and placed in my car. I had never gone more than ten miles per hour while I was in the alley that I know about. I had done nothing to the boys to invite them to throw rolls at me or to engage in any boisterous conduct there.

"I do not remember whether the plaintiff was looking toward me or away from me; I just saw her momentarily before the accident. I had not noticed her before I passed these boys; *. * * I was looking forward. I saw the boys but did not see her; I did not see her until I passed these boys that there [were] throwing at me." [Brackets supplied.]

On cross-examination the defendant-appellee testified as follows:

"* * * I know it is the custom of people who trade in those stores to park out in the back. I expected to go in the store myself. I do not know whether there were several cars parked in the parking lots; I did not get that far to see. * * *

"* * * As I came down the alley there were some vehicles parked on my left-hand side; * *. There were some boys that were out in the alley at that time. They were coming toward me down the alley when I first saw them, that is, they were coming toward Twentieth Street; I saw them when I first entered the alley, as I crossed the sidewalk line.

"* * * They were walking toward me and I was going toward them. I do not remember whether they were more or less

in the center of the alley or next to the wall, but as I started in they scattered, some on one side and some on the other, which left open the alleyway in front of me. I had gone about half way down the distance I went in the alley when the boys scattered.

"They began to throw at me when they got even with the car; some of them when they were even with where I was sitting. I do not know how many times they threw at me; I would say several times. I struck the plaintiff right after that. When I first saw the plaintiff, she was going in the same direction I was. I suppose that I struck her with the right front wheel or bumper of my car. She did not turn around that I saw. I did not blow my horn.

"* * * The boys scattered when they saw me coming down the alley. They were facing me and coming in my direction. I did not see the plaintiff until just before I hit her. I put my brakes on just as quickly as I could. I guess that I struck her just at the same time I put my brakes on; that is my best recollection about it. I stopped as quickly as I could.

"* * * I do not remember anything in the alley that prevented me from seeing a person walking in the alley after the boys scattered and got next to the wall on one side and the vehicles on the other. I do not think that the plaintiff is taller than the boys that were in the alley. I would say that these boys ranged in age between ten and thirteen years, something like that.

"I knew, at the time I was using the alley there on that day, that automobiles were constantly passing and repassing up and down the alley, and that people were constantly passing and repassing in walking. * * * There were vehicles parked in the alleyway.

"On the former trial of this case, I was asked the question 'As you turned in and reached a point even with the sidewalk, there wasn't a vehicle between you and Nineteenth Street, not any kind of automobile or cart or wagon or bicycle, or any kind of vehicle; there wasn't a single one, was there?' to which I answered, 'I don't remember, if there was.' All that attracted my attention when I turned in was these boys coming toward me. I was not watching the boys at the time the accident happened, but, naturally, when they threw at me, it attracted my attention. * * *."

The witness Hannah stated that during a period of five minutes he had seen some boys standing in the back door of Hill's store throwing some kind of bread around in the alley; and did not say that he had seen them throw bread directly at other cars; that he did not see the boys any more after the lady hollered; that they were there "just a minute before it happened," and he "did not know whether the boys were pelting this lady with bread there."

The plaintiff in her testimony affirmed the fact that the boys were in the alley and she was asked if she saw the boys throw there at all and answered that she did not remember seeing them throw anything.

We have carefully examined the testimony and find no evidence which would have justified the trial court in submitting to the jury the issue of wantonness. The circumstances that produced this accident were unusual. The conduct of the group of boys loitering in the alley, victimizing the members of the public who chanced to pass that way, was reprehensible. Through the execution of their sudden and disconcerting prank of throwing bread at drivers of automobiles a sudden emergency was presented. The testimony of Haynes verified such fact and said that these boys were standing over there and as cars would get right close by, they would draw back like they were going to throw a rock or something through the glass and that this conduct had been going on for some few minutes.

The testimony of defendant-appellee was to the same effect; that the boys gave her no warning; that she did not know they were going to play pranks on her; that they threw rolls or something and scattered around the car; that just as the boys got out of the way she saw plaintiff right in front of the car and tried to stop the car first, before she struck the plaintiff. Looking to her whole testimony, it is apparent that she stopped the car before entering the alley, proceeded through the alley at a very low rate of speed and not in excess of ten miles an hour. This fact was verified by the witness Haynes.

All of the witnesses say that appellee was within a short distance of the wall to her right, was observing conditions ahead and keeping a lookout by seeing the boys coming toward her.

The evidence nowhere showed that appellee would be set upon suddenly, that an emergency would be presented in which she had not a moment to think and for which to prepare and for which she was in no wise to blame. She conducted herself with judgment and care, rather than with wanton disregard. When the testimony of the witness Haynes is considered, it is to the effect that appellant was in the clear of the path of defendant's car as she first proceeded along the alleyway; that the boys at the back door of the bakery throwing bread, facing passing automobiles, had been there some few minutes; that plaintiff was walking about 3 or 3½ feet from the building, "and just as she got by the boys, she went in an angling direction toward the center of the alley"; that witness did not see her look or "do anything before changing her course there"; and that she was "not over four or five feet from the group of boys when she started angling across the alley." Such was the fact that ruled the case of Tindell v. Guy, 243 Ala. 535, 10 So.2d 862.

The rule of sudden emergency is well understood in this jurisdiction and was applied in Green v. City of Birmingham, 241 Ala. 684, 688, 4 So.2d 394; Hulsey v. Illinois Central R. Co., 242 Ala. 136, 5 So.2d 403. See, also, The Bywell Castle Case, L.R. 4 Prob.Div. 219, 222.

In consideration that a sudden emergency was presented by the attack of the boys; that immediately thereafter appellant changed her course toward the center of the alley; that the driver of the automobile had only a few feet within which to act or sound an alarm in the premises; that she stopped the car immediately upon seeing appellant in her path as one witness expressed it "like it hit a brick wall," it is clear to us that appellee was guilty of no wanton conduct.

It results that the trial court was correct in refusing to submit to the jury the issue as presented in count two of the complaint.

It follows from the foregoing that the judgment of the trial court is due to be affirmed and it is so ordered.

Affirmed.

GARDNER, C. J., and BROWN and LIVINGSTON, JJ., concur.