20 So.2d 599

**MONTGOMERY CITY LINES, Inc., v. JONES.**

3 Div. 418.

Supreme Court of Alabama.

Jan. 18, 1945.

Steiner, Crum & Weil, of Montgomery, for appellant.

Hill, Hill, Whiting & Rives and Walter J. Knabe, all of Montgomery, for appellee.

THOMAS, Justice.

The suit was for personal injury resulting in death in the negligent operation of a motor bus as a common carrier of passengers for hire while plaintiff's intestate was a passenger thereon.

During the progress of the trial all original counts of the complaint were withdrawn and count four substituted. The demurrer, which had been filed to the original complaint, was refiled to count four, and overruled, and appellant then pleaded in short, the general issue, contributory negligence, etc.

On the afternoon of December 2, 1942, plaintiff's intestate was a passenger on one of appellant's buses, on what is called its Washington Park line, having entered the bus in the downtown section. There were about fifty passengers on the bus, which was capable of carrying about sixty-five. There were seats for only about thirty-five, and a good many passengers were standing.

Leaving the downtown section, the bus proceeded west on Church Street, thence out Holcombe Street to Jeff Davis Avenue. There were three regular stopping points before reaching the point of the accident—one at Clayton Street, thence up a rather steep incline to Mildred Street to another stop and traffic light, then about midway the block, where South Street ends, the third stop. The next intersecting street is West Jeff Davis Avenue, where there is a regular stop, and Holcombe Street ends; the route then goes on out West Jeff Davis Avenue towards Washington Park.

This bus was in charge of one Thompson, who took it over about 2:30 that afternoon, and this was his second trip, when the accident happened. There was evidence tending to show that after leaving South Street and as the bus was approaching Jeff Davis Avenue, or about midway the half block, traveling at the rate of about fifteen miles per hour, the rubber hose portion of the air brake line blew out, making a noise about like a pistol, or, as some evidence showed, about like a "tire blow-out," with a sort of whistling sound. The sample of the rubber hose in use is certified to this Court as one of appellant's exhibits. This blow-out released the air, rendering the air brake useless, and the bus was brought to a stop as quickly as possible, by the use of the emergency or hand brake, and within from about two bus lengths to 150 feet from the point of the blow-out.

The mechanism by which the doors were opened and shut was, by the blow-out of the hose and resultant release of the air, rendered useless, and the doors could be opened and shut only by hand, which method was used on this occasion. The blow-out or explosion caused some dust to arise from the floor of the bus, or, according to some of the witnesses, some smoke, and there were some sparks to the rear of the bus. Some of the passengers began to holler, "Fire!" or "This bus is on fire!" and there was some excitement among the passengers. According to some of the witnesses, the rear door came open while the bus was coming to a stop. Others said

the door was not opened until the bus stopped. There was the cry that, "A woman jumped out back there." When the bus stopped, the driver and others went back, found plaintiff's intestate, a negro woman about 24 years old, lying on the curb unconscious, her neck probably broken, and from which injury she died in a day or two.

There was a difference among the witnesses as to how this woman went out of the bus. Some of plaintiff's witnesses say she was pushed out of the door by other passengers, while several of the witnesses said they were standing immediately in front of the rear door and that she did not go out of the door at all. There was an open window on the curb side of the bus, next to the rear door, about 18 inches above the seat, size 26 by 30, and large enough for a "good size man" to go out of, but no one testified that they saw her go out of the window.

The bus driver Thompson testified that he didn't know when or how she went out of the bus, nor anything about her being pushed off by any one. The front door was not opened until the bus came to a stop, when the bus driver opened it by hand and got out and went back to where the woman lay. An ambulance was called, the woman was taken to a hospital, and this bus was taken back to the shop under its own power, nothing being wrong with the exception of the air brakes or the hose, a material part of its operation.

No one else on the bus got out while it was moving, and no one else was hurt in any way.

Thompson, the bus driver, testified that there had been no previous trouble with this brake line; and by the testimony of Hopkins, the shop foreman, and Edwards, his assistant, it was shown that this rubber hose was manufactured by the Westinghouse people, who are regarded as reputable manufacturers of high-grade standard material of this character, a necessary part of that brake equipment; that it was connected to two copper fittings—a part of or forming the brake line, the rubber hose portion being necessary because of its flexibility; that the explosion blew the hose in question into two parts; that the ordinary or normal life of the hose was from two to three years, and that this particular hose was installed on the bus, new, on September 21, 1942, a little over two months before the accident, when the for-

mer hose then on the bus was found to have a little leak in it. At that time the bus was given a thorough checking and everything necessary to be done was done. The new hose was examined when it was installed, and found to be free of any defects that could be discovered.

The evidence further showed that the bus was next inspected November 22, 1942, about ten days before the accident, there being nothing found to indicate any defect or imperfection. What is called a minor inspection of these buses is made about every 1000 or 2000 miles, and what is called a major inspection, which means the checking of everything about the bus, about every 3000 miles, which was as often as considered necessary in the operation of the business. This hose, the shop foreman said, was understood to withstand about 1000 pounds air pressure, and the amount of pressure applied to it by the bus would be only about 150 pounds.

The testimony of plaintiff's witness Curry tended to show that, he was a passenger on the bus; when the bus started up the hill out of Church Street at Fitts Hill Hospital, "That's where the trouble began; it was smoke and fire popping from the bus;" but that this condition stopped a while, until they got down to Holcombe and Mildred Streets. That the bus stopped at Mildred and let some passengers off and the driver opened the door and the bus was thereafter running with the door open. About the middle of the block, the bus seemed to be going about 35 miles or over, when some people started hollering out, "Fire popping out," and that there was fire coming out at the time from under the cushion of the back seat. That the fire was not coming up from the floor, just coming from under the cushion. Didn't come up at all, just came out. He didn't know whether anybody was sitting on the burning seat or not. That some folks tried to "knock" to make the bus driver stop, but he did not stop. "The little girl in front of me was holding the rod; she was backwards, standing this way, holding the rod, and when the people started rushing so much about the fire back there, they pushed her out backwards." That "everybody on the back seat forced her off. That's the only way I can figure it out." That plaintiff's intestate was the only one that fell off. Some children got off the bus next. They came from the front, when the bus "rolled down there

and stopped." That the bus ran on about 150 feet and then stopped.

This witness was asked by plaintiff's counsel, "Are you sure this woman fell off the bus? A. She was forced out of the door by the people hollering and going on, trying to get to this door, after the driver wouldn't stop. She was forced out of the door backward." Asked if he saw her at the time she hit the ground, he answered: "Yes, sir, seen her when she went out of the bus, and so far as the bus was running I didn't look exactly straight back."

On cross examination, that witness stated he first saw this fire at the turn-off from Church Street; that it was a long block from there up the hill to Mildred, four or five hundred feet; that there was a regular stop at Church Street, but he says the bus didn't stop there. That the fire didn't continue to burn. It first occurred at the drug store (at Church and Clayton Streets), and then it stopped after it burned at least three minutes. Asked what set the fire, the witness said, "The motor." That the seat was burning all over, blaze was coming out, and that this was the seat he was sitting on; that there were about "50 or 56" people on the bus.

There was evidence tending to show that there were three regular stopping places before reaching the point of the accident. According to most of the witnesses, the bus stopped at each of them for the purpose of letting off or taking on passengers.

On redirect examination, the witness Curry said that when the trouble first started, "That hill seemed to be the trouble (first block of Holcombe), and after he got on level ground he didn't have no more trouble until he rolled down to Mildred." Asked if it made any noise coming up the street, said, "Yes, sir, from the looks of it, it seemed to be a knock, or something." That this fire and noise "bust out all at once." That nobody put out the fire, that he guessed it went out itself. That just after he left South Street the fire started again; it was bigger than the first one. That he smelled it and saw it too. Although there were two or three regular stopping places for the bus before the point of the accident, this witness did not, nor did any of the other passengers, so far as the evidence shows, signal for a stop or make any attempt to get off of the bus at any of those stops.

Every witness, both for the plaintiff and for the defendant, and the two mechanics who examined the bus after the accident, testified that there was no fire in the bus, nor any sign of fire on the bus. Defendant's evidence was to the effect that the motor was underneath a solid steel floor, and that while the blowing out of the air hose might have caused some sparks, it would not cause fire or a blaze. Plaintiff's witness Curry was contradicted on other matters by practically all the other witnesses in the case. He said he had never talked to anybody about the case except the "lawyer" for the bus company, whom he identified as Mr. Smyly. He said he was bound to be a lawyer because he came out to see him; that he had never talked to anybody else about the case.

When the testimony for appellee was concluded, appellant moved to exclude the testimony, which motion the court overruled, saying, "I think there is enough to take the case to the jury." Appellant excepted to the overruling of its motion, and this ruling is assigned in error.

The trial court gave certain special charges requested by appellee and refused certain special charges, including the general affirmative charge, requested by appellant, and each of these rulings is assigned as error.

The jury returned a verdict for the plaintiff for the sum of four thousand ($4000) dollars.

Appellant subsequently filed its motion to set aside the verdict of the jury and grant it a new trial, which motion the court overruled, and this action of the court constitutes one of the assignments of error.

■ There was no error in overruling demurrer to count four of the complaint on which the trial was had. The facts particularized in that complaint constituted negligence as a matter of law. Jackson v. Vaughn, 204 Ala. 543, 86 So. 469; Buffalo Rock Co. v. Davis, 228 Ala. 603, 154 So. 556; William E. Harden, Inc., v. Harden, 29 Ala.App. 411, 197 So. 94, and authorities cited. The complaint concludes with the averment of negligence. Birmingham Ry. Light & Power Co. v. Gonzalez, 183 Ala. 273, 61 So. 80, Ann.Cas.1916A 543; Prudential Ins. Co. of America v. Zeidler, 233 Ala. 328, 171 So. 634.

■ In determining whether an affirmative charge should be given for a defendant, this court looks to the strongest tendency of evidence for plaintiff. Jack Cole,

Inc., v. Walker, 240 Ala. 683, 200 So. 768; Godfrey v. Vinson, 215 Ala. 166, 110 So. 13; McMillan v. Aiken, 205 Ala. 35, 40 88 So. 135; Simon v. Goodman, 244 Ala. 422, 13 So.2d 679.

There were adverse tendencies in the evidence as to the emersion of smoke or sparks or fire within, and as the bus proceeded on its way from down town and for some distance before it reached the point of the blow-out of the hose or injury, and that the emersion of sparks to time the bus stopped; and that the defendant's agent in charge of the bus did not stop or investigate it in response to the calls or warnings of the passengers, and that plaintiff's intestate was either pushed off the car by the excited passengers or fell out the opened door, one witness saying that the car was running "when Mary went out."

■ The bus company, as a public carrier of passengers, owes to its passengers a very high degree of care, skill, and diligence known to careful, diligent, and skillful persons engaged in such business; yet the protective measures required are limited to such as are consistent with the practical operation of that business, and does not mean that every possible or conceivable act of care or precaution which might increase or even assure the safety of a passenger must be taken, but only such as are reasonably practicable under the circumstances, and such as is reasonably consistent with the practical operation of such carrier's business. Birmingham Ry. Light & Power Co. v. Barrett, 179 Ala. 274, 60 So. 262; Pollard v. Williams, 238 Ala. 391, 191 So. 225.

■ The carrier is not an insurer of the safety of its passengers. The fact that a person may be injured while a passenger in or on the bus does not, without other evidence, within and of itself show negligence. The burden is upon the plaintiff to prove not only some specific negligence, but that such negligence was the direct, proximate and efficient cause of the injury. He must prove the causal connection between the negligence complained of and the injury. Britt v. Daniel, 230 Ala. 79, 159 So. 684.

In Louisville & N. R. Co. v. Maddox, 236 Ala. 594, 183 So. 849, 851, 118 A.L.R. 1318, it was held that: "Where the act and the injury are not known by common experience to be naturally and reasonably in sequence and the injury does not in the ordinary sequence of events and under the circumstances follow from the act, they have been held not sufficiently connected to make the act the proximate cause." The question was lately discussed in Birmingham Electric Co. v. Davis, 244 Ala. 338, 13 So.2d 888.

The jury had the right to look at the combined effect of the explosion of the hose, the fact of whether or not the door was opened and how the excitement caused by the blowing out of the hose affected the immediate passengers in the bus.

It is not necessary that we collect and analyze the many cases by this court on proximate cause so well stated in Armstrong, Adm'x, v. Montgomery St. Ry. Co., 123 Ala. 233, 26 So. 349. The later decisions have adhered thereto. Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610, Id., 222 Ala. 120, 130 So. 807; Clendenon v. Yarbrough, 233 Ala. 269, 171 So. 277; Louisville & N. R. Co. v. Maddox, supra; Tindell v. Guy, 243 Ala. 535, 537, 10 So.2d 862. These decisions are in accord with the general authorities on the question indicated in Sullivan, Admr., v. Alabama Power Co., ante, p. 262, 20 So.2d 224.

■ Assignments of error are based on the giving of written charges E and F requested by the plaintiff. Charges similar to these were condemned in Irwin v. Louisville & N. R. Co., 161 Ala. 489, 50 So. 62, 135 Am.St.Rep. 153, 18 Ann.Cas. 772, and in Tomme v. Pullman Co., 207 Ala. 511, 93 So. 462, 464. Such charges were condemned because they exact too high a degree of duty on the part of a common carrier to protect its passengers from violence by other persons. In the last cited case the law is thus stated:

"While the law requires a high degree of care on the part of the carrier's servants to protect the passenger while on the vehicle from injury or insult from another when the wrong is actually foreseen, it only requires ordinary care and prudence in foreseeing or anticipating the threatened violence or insult. In other words, if the defendants knew of the intoxicated condition of McGarrity, and that it was such that they could reasonably foresee, or anticipate, that he would probably insult or injure the plaintiff's wife, they owed her a high degree of care to use all reasonable precaution to protect her. We know

of no rule of law, however, that required the defendants' servants to be expert in ascertaining the intoxicated condition of McGarrity, or in foreshadowing the probable consequence of same."

In this case the panic among the passengers was observed by the operator of the bus who said that he had just gotten a fair speed leaving South Street when he heard the report of the airbrake hose blowing out and the passengers started hollering "Fire," when he observed a little dust fly up in the bus that came from the airline hose blowing out. Culpability for dereliction in regard to circumstances covered by the conflicting evidence is for the jury, "under the particular circumstances of each case." Briggs v. Birmingham Ry., Light & Power Co., 188 Ala. 262, 269, 66 So. 95; Sullivan, Admrx., v. Ala. Power Co., ante, p. 262, 20 So.2d 224; Birmingham Electric Co. v. Davis, supra.

We may further observe that Mr. Justice Foster has well stated the principle of cause or event and the application of that rule in Braden v. St. Louis-San Francisco R. Co., 223 Ala. 659, 661, 137 So. 663, 664, as follows:

"When the immediate cause of the injury is an intervening event, the question then is to determine whether such intervening event is itself a direct result of the negligent act. And, when our courts and other authorities say that the injury must be known by experience to follow the negligent act in a natural and reasonable sequence, I think that this is so, if it follows as the direct result of some other cause, which is itself the natural and reasonable result of the negligent act. It is not necessary that every detail of result be contemplated if such detail directly follows from a cause which is the ordinary and natural result of the negligence, for such cause is not in that event an independent one. * * *"

We have heretofore indicated that there was no error in refusing the general affirmative charge requested by defendant. In giving at the written request of plaintiff special charges E and F reversible error intervened and the judgment of the circuit court is reversed and the cause is remanded.

Reversed and remanded.

GARDNER, C. J., and FOSTER and STAKELY, JJ., concur.