149 So.2d 821

**BLOUNT BROTHERS CONSTRUCTION COMPANY**

v.

**Daisy J. ROSE et al.**

**8 Div. 12.**

Supreme Court of Alabama.

Nov. 29, 1962.

Rehearing Denied Feb. 7, 1963.

430

Eyster & Eyster, Decatur, for appellant.

Harris & Harris, Decatur, for appellees.

PER CURIAM.

The appeal in this case arises out of a judgment for the plaintiffs in the sum of $60,000.00, in a suit filed by the widow and minor son of the deceased, William Earl Rose, who at the time of his death was employed by subcontractors of appellant to assist in the installation of plumbing and heating fixtures in a building under construction at Redstone Arsenal in Madison County.

The deceased met his death under circumstances which the plaintiffs claim were the proximate result of wanton conduct on the part of appellant (defendant in the Circuit Court). More details surrounding the death of Mr. Rose, so far as they are pertinent to the assignments of error that are argued by appellant, will later be delineated in this opinion.

### Assignment of Error 1.

This assignment charges the trial court with error in overruling appellant's demurrer to Count E of the complaint. All other counts in the complaint were eliminated by the plaintiffs at the close of the evidence. Only those grounds of demurrer adequately argued by appellant in its brief are entitled under the law to be here considered.

The Reporter will set out the complaint.

Appellant, in its brief, directs the attention of this court to twelve grounds of de-

**432**

murrer and omits adequate argument as to other assigned grounds. We will consider only the twelve grounds that have been argued. Linville v. Crittenden, 272 Ala. 630, 133 So.2d 381[4, 5]; Vol. 2A, Ala.Digest, Appeal and Error, ☞1078(1).

The contention of appellant in its argument is that Count E is deficient because it undertakes to allege facts which at their most constitute simple negligence and are insufficient to support the wanton allegation near the end of the complaint, citing Birmingham Ry., Light & Power Co. v. Brown, 150 Ala. 327, 43 So. 342.

This court, from time to time, using different phraseology, has stated the constituent and essential elements of wanton conduct. Simon v. Goodman, 244 Ala. 422, 13 So.2d 679; Dean v. Adams, 249 Ala. 319, 321, 30 So.2d 903, 904; Griffin Lumber Company v. Harper, 247 Ala. 616, 25 So.2d 505, 506; Atlantic Coast Line R. Co. v. Brackin, 248 Ala. 459, 28 So.2d 193, 194; Wilhite v. Webb, 253 Ala. 606, 46 So.2d 414. We quote briefly from Griffin Lumber Company v. Harper, supra, as follows:

> "Wantonness is the conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury. (Citations omitted.)" (247 Ala. at page 618, 25 So.2d at page 506.)

The complaint alleges: (1) that the defendant owed Rose a duty; (2) that the defendant breached this duty; (3) that defendant knew and was conscious that a breach of this duty would likely cause serious injury or death to Rose or his coworkers; and that (4) notwithstanding said knowledge, and as a result of defendant's wantonness in allowing such unsafe conditions to remain uncorrected Rose fell and was killed as a proximate result of such wantonness.

The argued grounds of demurrer fail to point out or particularize wherein the complaint fails to aver the constituent or essential elements of wantonness. If the complaint is subject to demurrer on the ground that it undertakes to allege the quo modo, but is insufficient in that respect because it does not allege the defendant, its agents or servants, notwithstanding their knowledge of conditions, consciously and intentionally, with reckless indifference to the consequences, failed to correct the alleged unsafe conditions, we have to observe that no such ground was assigned in the several grounds which defendant argues on this appeal. In the absence of this assignment, we cannot consider this omission if it existed. Buffalo Rock Co. v. Davis, 228 Ala. 603, 154 So. 556(8). The complaint is not subject to demurrer on any of the grounds assigned and argued in this appeal. Linville v. Crittenden, supra.

### Assignment of Error 10.

This assignment charges the trial court with error in refusing defendant's written charge, which, according to its text, is affirmative in purpose with hypothesis. Delineation of some of the evidence at this point is appropriate.

Appellant entered into a written contract with the United States Government to construct a shop building (No. 3) at Redstone Arsenal in Huntsville. The building as constructed is 300 or 315 feet long, north and south, and 60 or 65 feet wide. The contract included painting, and electrical, plumbing and heating installations.

Appellant subcontracted the electrical work to T. D. Little Electric Company, the plumbing and heating installations to Nichols Plumbing and Heating Company, and the painting to someone else. Mr. Rose, at the time of his death, was an employee of Nichols and was the foreman of the crew engaged in installing the heaters.

The heaters were being attached to the roof of the building with suspension rods that lowered them to about 30 feet above the concrete floor of the building. The particular heater, weighing 800 to 1000 pounds, which Mr. Rose and his coworkers were installing, was right close to the east end of the building.

The heaters were lifted from the floor to the point of suspension by a winch on a truck and they first came to rest on a scaffold that was supported by an interior crane within the building. The crane was a permanent adjunct to the building.

The crane consisted of two steel girders or eye-beams extending east and west from one wall to the other. On the surface of these girders or beams was a slightly elevated track for the operation of the hoist east and west. This hoist was not being used at the time. On each side of the tracks was a flange approximately eight inches wide. These beams were separated approximately four to four and one-half feet.

A steel beam or girder, with a track on top, was permanently anchored to the west wall of the building, the same height as the beams extending east and west. A like beam was also anchored to the east wall at the same height. The east and west beams had wheels at their respective ends that operated on these north and south tracks. Thus the crane could be moved north and south from one end of the building to the other, while the hoist on the crane could be moved east and west from one wall to the other.

On the south side of the crane was a catwalk running east and west the entire length of the crane. There was no catwalk on the north or opposite side of the crane. Running the entire length of the catwalk was a shaft or rod that could be operated by a motor attached thereto or manually with a wrench to move the crane north and south, thus making the crane available for use anywhere in the building.

Appellant was importuned by the painting, electrical, and plumbing subcontractors to erect a scaffold on the crane for use of the men working for the subcontractors. Responding to this request, appellant directed its carpenters to build the scaffold which they did.

The scaffold was about four feet high above the eye-beams that ran east and west and rested thereon. Substantial uprights were used. An upright rested on the inside flange of one beam, and another on the opposite side on the other beam. They were spread in sections about 10 feet apart for the entire length of the beams. Each section was braced on the east side as well as on the north and south sides. The thickness of the braces was three-fourths of an inch and some one inch. The braces on the north and south sides were firmly nailed to the top and bottom of the posts in an "X" pattern. The braces on the east side of the uprights were firm and secure. Firmly anchored to the top of the vertical posts or uprights was a horizontal member the same dimensions as the uprights. The scaffold was sturdy.

On top of the horizontal supports were some pick boards or platforms. Appellant did not own them or put them into place. These boards served as a flooring and could be moved from one point to the other on the scaffold. They were long enough to more than cover one section of the scaffold. Each pick board (three or four in number) resembled a ladder with narrow boards nailed to the horizontal steps of the ladder. There were some cracks between some of the planks on the pick boards which, as we understand from the evidence, were covered with plyboard. The pick boards were placed on the scaffold in such a manner that the south edge was practically flush with the south side of the scaffold, while on the north side the board was not flush with the edge. There was a factual dispute between plaintiffs' evidence and defendant's witnesses, or some of them, as to the distance that the board lacked being flush with the north side of the scaffold. The defendant contended that the space was 24 inches, while plaintiffs contended the space was considerably less.

A further tendency of plaintiffs' evidence was that the end of the scaffold was practically up against the east wall, with the end of the pick boards protruding beyond the east horizontal member upon which they rested. There was agreement that the model crane used by both parties before the jury did not accurately reflect the distance the end of the crane was from the east wall nor the exact position of the uprights from the end of the crane.

The evidence of the parties was in conflict as to whether or not the pick boards were fastened to the horizontal members upon which they rested.

Plaintiffs' evidence tended to show that a worker on the north side of the crane, where the decedent was when he fell, could not safely go around the east end of the crane to get to the south side, because of the close proximity of the crane to the wall and the presence of the overlapping pick boards. Proceeding this route, plaintiffs' evidence tended to show that the worker would have to walk on the end of the crane close to the wall, and in so doing, would have to stoop low to get under the end of the protruding pick boards, while at the same time would have to put each foot on a very narrow ledge of steel on the crane while straddling a gaping hole 24 inches wide. Thus, contended the plaintiffs, this passage was more dangerous than across the scaffold. Defendant offered evidence that was in conflict with the plaintiffs' evidence as to some of these physical factors and the alleged danger.

The evidence of plaintiffs further tended to show that after the heater was lifted from the floor and came to rest on the surface of the scaffold, it had to be lifted two or three inches from the surface by a "come-a-long" hoist, hand-operated, to the end that it could be put in a metal cradle fastened to bars suspended from the roof.

The cradle consisted of two iron bars, running north and south under the heater, that were fastened at each end by a nut or bolt to the suspension bars. Mr. Rose and his coworker worked from the north side to fasten the cradle bolts, while two other employees worked likewise on the south side. Plaintiffs offered evidence that the presence of two men on each side was necessary according to the instructions of the superintendent. Defendant offered testimony that there was no necessity for the deceased and his companion to operate from the north side. There was a marked conflict in this testimony. Also, there was a conflict of the testimony as to the weight of each channel.

It also appears from plaintiffs' evidence, and from some of defendant's witnesses, that Mr. Rose, at the time he fell, was attempting to get on the scaffold from his perch on the eight or ten-inch flange on the north side of the steel beam. In so doing, he put his right foot on the top brace and his left foot on the lower brace, both to the left of the center. While in this position, he reached for the pick board and either lost his grip or failed to grab the board. He fell forward over the top of the braces into the space or void between the cross braces and the pick board nearest to him. He plunged 30 feet to the concrete flooring, the impact causing his death.

Appellees' contention is that appellant, defaulting in its contractual duty, wantonly failed to provide a reasonably safe place for Mr. Rose and his coworkers to work while installing the heaters. They allege "that there was no sufficient footstep or means of access from the crane to the scaffold and no sufficient hold to use in climbing from the crane to the scaffold so that a person could climb from the crane to the scaffold with reasonable safety," and as a proximate result of the alleged wantonness in "allowing such unsafe conditions to remain uncorrected," Mr. Rose was killed as alleged.

Appellees offered in evidence a copy of defendant's contract with the United States Government for the erection of the building and the installation of some appurtenances and accessories. Also, plaintiffs

were allowed to introduce in evidence a manual of safety rules which appellant, according to appellees, agreed to observe in the performance of its contract. Both were abridged in the transcript of this appeal pursuant to an approved agreement. We quote several sections or provisions which we deem pertinent to the issues in this case:

"Statement of Work. The Contractor shall furnish all labor, equipment, and materials and perform the work above described for the amount stated above in strict accordance with the General Provisions (Standard Form 23a) specifications, schedules, drawings and conditions all of which are made a part hereof and designated as follows:

\*    \*    \*    \*    \*    \*

"GENERAL PROVISIONS

\*    \*    \*    \*    \*    \*

"10. SUPERINTENCENCE BY CONTRACTOR

"The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for him.

\*    \*    \*    \*    \*    \*

" '29. ACCIDENT PREVENTION. —(a) In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract; the Contractor will comply with all pertinent provisions of the Manual 'Safety Requirements' approved by the Chief of Engineers 16 December 1941, as revised 16 April 1951, and as may be further amended, and will also take or cause to be taken such additional measures as the Contracting Officer

may determine to be reasonably necessary for the purpose.

\*    \*    \*    \*    \*    \*

"(d) Compliance with the provisions of this article by subcontractors will be the responsibility of the Contractor.'

*"SPECIFICATIONS*

\*    \*    \*    \*    \*    \*

*"PART II – GENERAL CONDITIONS*

\*    \*    \*    \*    \*    \*

"GC–18. *ACCIDENT PREVENTION:* In addition to full compliance with the requirements of the article of the contract entitled 'Accident Prevention', the Contractor will comply with the following provisions:

\*    \*    \*    \*    \*    \*

"(b) During the performance of work under the contract, the Contractor shall comply with all procedures prescribed by the Contracting Officer for the control and safety of persons visiting the job site and will comply with such requirements to prevent accidents as may be specified under the Special Conditions of these specifications or issued by the Contracting Officer.

"GC–19. *INSPECTION:* The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. \* \* \*"

Articles II(a), III(a), and VI(a) and (b) of the subcontract provide as follows:

"Article II – (a) Contractor shall have the same rights and privileges as against the Sub-Contractor herein as the Owner in the General Contract has against Contractor."

"Article III – (a) Sub-Contractor shall begin work as soon as instructed

by Contractor, and shall carry on said work promptly efficiently and at a speed that will not cause delay in the progress of Contractor's work or other branches of the work carried on by other sub-contractors. Contractor may require Sub-Contractor to prosecute in preference to other parts of the work such part or parts as Contractor may specify."

"Article VI — (a) Sub-Contractor shall at all times supply adequate tools, appliances and equipment, a sufficient number of properly skilled workmen and a sufficient amount of materials and supplies of proper quality to efficiently and promptly prosecute said work and shall promptly pay for all materials purchased and shall pay all workmen each week and obtain and furnish Contractor weekly with two copies of payroll verified by affidavit.

"(b) The Sub-Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent satisfactory to Contractor on the work at all times during progress with authority to act for him."

The manual "Safety Requirements" referred to in Section 29 above, provides as follows:

" '20–1. Scaffolds, platforms, or temporary floors shall be provided for all work except that which can be done safely from the ground, other substantial footing or from ladders.

\*   \*   \*   \*   \*   \*

" '20–2. Stairs, ladders, or other safe means of access shall be provided to all work areas. The use of cross braces or frame-work as a means of access to working surfaces shall not be permitted.' "

Evidence was adduced from appellees' witnesses, and from some of the others who testified, that there was no way to mount the scaffold from the south side except by a stepladder or the cross braces. The ten-dency of plaintiffs' evidence was that there was no safe way to mount the scaffold from the cross braces on the north side. There was a conflict of testimony between the parties as to whether or not any ladder was on the south side when Mr. Rose fell. As to when the ladder was there, if at all, was the subject of conflicting testimony. There was no evidence that there was a stepladder or other means, except the braces available on the north side, to mount the north side at the point from which Mr. Rose fell.

Mr. Berrey O. Morgan, Project Superintendent for appellant, testified as a witness for defendant that he had been through the building while the heaters were being installed. On cross-examination, he testified as follows:

"Q   Had you seen how they were installing the heaters?

"A   Not in the sense to describe it, I didn't. I walked through and saw the work going on and the scope of the work I have to see after. Unless something is called to my attention or I see something that is not correct, I don't go into details. I have other men under me designated for that purpose.

"Q   Whom did you have designated for that purpose?

"A   I had Mr. Lanier as carpenter foreman, Mr. Gust as engineer, Mr. Green as general carpenter foreman and there were three or four other engineers that were there for the purpose of following the work of the other contractors.

"Q   And it was their duty to observe the work more closely than you were able to on account of limitation of time on your part?

"A   Yes, sir.

"Q   And they did that?

"A   They did that."

This witness also testified that a stepladder was provided when the scaffold was built, to be used in mounting the scaffold; that the ladder was furnished by the subcontractors; that he saw it the day the men started to work; that to the best of his knowledge it remained there all the time, and that it was still there the day of the accident. This witness also testified that no one was supposed to mount the scaffold anywhere except from the south side, and that there was no means provided for mounting except on the south side. He also stated that mounting the scaffold via the stepladder was safe; also that it was locked behind the shaft on the catwalk and could not be moved.

Evidence of this witness contradicted that of appellees as to the unsafe conditions imperiling a worker going from the north side to the south side via the east end of the crane. Appellant offered other evidence, which we will not undertake to delineate, that contradicted plaintiffs' evidence in several areas of contentions between the parties.

We hold that the provisions of appellant's contract with the government, so far as they imposed upon defendant the duty to furnish safety devices for the project, were for the benefit of Mr. Rose and his fellow workers on this project, and this action will lie so far as it arises out of the breach of this contract. Plaintiffs could sue in tort for damages arising out of the alleged breach. The contract and the law imposed the duty on appellant to provide a reasonably safe place for Mr. Rose and his fellow workers to work on this project. Tennessee Coal, Iron & R. Co. v. Sizemore, 258 Ala. 344, 62 So.2d 459; Evans v. Patterson, 269 Ala. 250, 112 So.2d 194. We said in Tennessee Coal, Iron & R. Co. v. Sizemore, supra:

"But even when the complaint shows that the breach of the contract was also a negligent failure to perform a duty which the law imposes by reason of such contract, the injured employee may sue either for the breach of the contract when he is a party to it, or it is made for his direct benefit, or may sue in tort for the breach of the duty imposed by law. (Citation Omitted.) So that, if we assume that the facts alleged show a duty on the part of defendant to exercise due care to furnish plaintiff a reasonably safe place to work by reason of his employment, as in effect stipulated in his contract, and that his negligent failure in that regard furnished ground for a tort action, (Citations Omitted.), it does not follow that defendant may not also be liable for a breach of its contract to do so.

"Under such circumstances, the injured employee, who is a party to the contract or one for whose direct benefit it was made, may sue for its breach in assumpsit, or may sue in tort for negligence in failing to perform a duty imposed by law. He has an election in that respect. (Citations omitted.)" (258 Ala. at page 350, 62 So.2d at page 464.)

Wantonness as charged must rest upon appellant's or its servant's or agent's actual knowledge, but such knowledge need not be shown by direct proof. It may be made to appear like any other fact, by showing circumstances, as in this case at issue, from which the fact of knowledge is a legitimate inference. Birmingham Electric Co. v. Mann, 226 Ala. 379, 147 So. 165.

Under our decisions, wantonness of the deceased Rose is not a defense to this complaint. Nor is assumption of risk, which is in the nature of wantonness, a good defense. Foreman v. Dorsey Trailers, 256 Ala. 253, 54 So.2d 499.

Wantonness may arise from knowledge that persons, though not seen, are likely to be in positions of danger, and with conscious disregard of known conditions of danger and in violations of law, disaster occurs. Godfrey v. Vinson, 215 Ala. 166, 110 So. 13.

■ It was a jury question as to whether or not there was any necessity for Mr. Rose to work on the north side of the crane where he went to put the channel under the heater and fasten the bolts. The heater protruded about six inches on each side of the surface upon which it was slightly elevated. One of the witnesses helping to install the heater testified that four could not have worked on one side at the same time; that the superintendent saw the way they were doing it and they had to do it that way. The facts in the case of Barger v. Oswalt, 239 Ala. 289, 194 So. 884, cited by appellant, did not show a necessity for the plaintiff, Barger, to take his foot and push a log into position before the saw. Barger's foot slipped and was caught in the revolving saw. The necessity of Mr. Rose and his coworker taking their position at or near the north side to fasten the channel on the north side was for the jury.

The evidence in this case and the legitimate inferences to be drawn therefrom presented issues of fact for the decision of the jury. The refusal of the affirmative charge with hypothesis requested by the defendant was not error. Southern Building & Loan Ass'n v. Bryant, 225 Ala. 527, 144 So. 367.

### Assignment of Error 60.

■ This assignment presents for review the written charge of defendant, refused by the court, the text of which is as follows:

"'10. I charge you, gentlemen of the jury, if you are reasonably satisfied from the evidence that the deceased voluntarily chose an obviously and known and appreciated dangerous way, place and manner in which to get upon the scaffold, and that his injuries and death were proximately and solely caused by the deceased, negligently attempting to mount the scaffold in an obviously and known and appreciated dangerous way, manner and place, plaintiffs would not be entitled to recover.'"

This charge is referred to as the "sole proximate cause" charge. It is not a defense to a wanton count. The jury under the charge would be required to consider the initial negligence of Mr. Rose, and if true, this negligence would be made a bar to a recovery for wantonness alleged in the complaint. The initial negligence of Mr. Rose, if a fact, would not preclude recovery against the defendant for affirmative or omissive wantonness. Seitz v. Heep, 243 Ala. 372, 10 So.2d 148; Boyette v. Bradley, 211 Ala. 370, 100 So. 647. Wantonness is no defense to wantonness. Foreman v. Dorsey Trailers, supra.

### Assignments of Error 24, 34, 36, 37, 40, 52, 63, 64, 66, 67, and 79.

The refused charges for defendant, subjects of the above assignments, are based on negligence or wantonness on the part of the deceased Rose as a defense. They were properly refused for these reasons if for no other. Seitz v. Heep, supra; Boyette v. Bradley, supra; and Foreman v. Dorsey Trailers, supra.

### Assignment of Error 83.

■ Appellant contends here that the court erred in permitting witness Cramer, for the plaintiffs, to testify that he was shocked for a minute after Mr. Rose fell from the scaffold.

The reaction of the witness to the tragedy as stated before the jury was not calculated to influence the jury in its deliberations, but if so, was without injury to the defendant. Supreme Court Rule 45. The jury heard the evidence as to the nature of the injuries that Mr. Rose suffered from the fall. They had their own reaction from the evidence essentially free and independent of the statement of the witness that he was shocked.

### Assignment of Error 84.

■ Witness Cramer, for the plaintiffs, was allowed to testify, over the objection of defendant, that Mr. Rose was stretched out, blood was running from his ears, and his eyes were set in his head.

This evidence was permissible. Taylor v. Lewis, 206 Ala. 338, 89 So. 581. There this court held:

"It was proper for the witness to testify as to the appearance of the body, the marks on it or wounds. The child was run over by a car. It was averred that it was killed by the car. These wounds, marks, and appearance of the body were evidence of injuries received by the child from defendant's car. It would shed light on how it was killed. Birmingham Ry. Lt. & P. Co. v. McLain, 162 Ala. 656, 50 So. 149. * * *" (206 Ala. at page 340, 89 So. at page 582.)

*Assignment of Error 103.*

■ Plaintiffs' counsel, over objection and exception of defendant, argued to the jury:

"'Why, a $25,000 verdict against Blount Brothers would not be a slap on the leg to them.'"

After the close of the oral charge of the court to the jury, counsel, the author of the remarks, made known to the court that he desired to withdraw this argument, and asked the court to charge the jury "to pay no attention to this."

Thereupon, the court charged the jury as follows:

"COURT: Gentlemen, you heard the statement of the attorney for the plaintiff(s), Mr. Julian Harris. I will charge you to forget the reference that he made and not consider that in any way. Of course, in any case, gentlemen, the assertions of counsel are merely their own statements or notions of what the evidence is and what the law is, and it is up to the Court to charge you on the law and it is up to you gentlemen to say what the facts are. You heard the evidence and you are reasonably intelligent men, possibly much more intelligent than we are, and

you be the judge of what the witnesses said and what the physical evidence is."

After the completion of this judicial observation to the jury, the following took place:

"Now, at the * * * TO MR. EYSTER: Do you have something?

"MR. BILL EYSTER: I just never heard of an argument withdrawn in that manner. We objected to that portion of the argument and assigned grounds and our objection was overruled.

"COURT: As the Court recalls, you didn't object to that part, but what he said right after that, I believe.

"MR. BILL EYSTER: It was that line of argument.

"COURT: It was after that you objected. He started out with that and then he went into the question of the larger amount and the court instructed the jury, as I recall, on that matter and I will instruct you again, because I think my memory is fresh on it; gentlemen, you are to judge the facts on the law that I have stated to you and the evidence stated to what—what the measure of damages as we lawyers call it—this measuring stick is, by which you measure the damages, if you are reasonably satisfied from the evidence the plaintiff(s) would be entitled to recover. I have charged you what the measure is in order to determine what the damages are, and I told you the law says the damages are such as the jury may assess, but they are entirely punitive, and are imposed for the preservation of human life, and the theory of the law and the object of the law is that you should give due regard to the enormity or greatness of the wrong, if you are reasonably satisfied there was a wrong; and secondly, to the necessity of preventing a similar wrong, and that the punishment by way of the damages is not intended alone to punish

the wrongdoer, but it is also as a deterent to others similarly minded. So, the size of the defendant, if you are reasonably satisfied from the evidence its size was any different from anybody else's, or the fact it was a corporation or not, should not enter in any way into your deliberation or your finding on the matter, because that is not what the law is intended for; and I am sure with that admonition you gentlemen will consider the facts as you heard them and the law as I have charged you and not necessarily what the lawyers said. I don't mean to say they have misled you; I don't think either one of them has, but I simply say to you the assertions of counsel are not evidence. They are merely their notions and theories and argument on the case and with that admonition, I believe will take care of that matter."

A similar argument was made in the case of Daniel Construction Co. v. Pierce, 270 Ala. 522, 120 So.2d 381. There the plaintiff observed before the jury:

"* * * 'if the jury brings out a verdict less than $50,000 it wouldn't be any more than a mosquito bite to this defendant.'" (270 Ala. at page 530, 120 So.2d at page 386.)

The trial court there sustained the objection of the defendant. The trial judge gave adequate instructions to the jury not to consider these remarks. This court held that the argument was eradicable from the minds of the jury, and that the instructions of the court not to consider the argument were sufficient.

In the case at bar, we hold that the court's instructions were adequate to eradicate the effect of this argument. We pretermit any consideration of the contentions of appellees that the argument, although withdrawn, was in reply to argument of counsel for defendant.

### Assignment of Error 104.

After completion of the oral charge, before the jury retired, defendant excepted to an excerpt of the court's oral charge:

"* * * These are damages over and above the sum (referring to punitive damages) that will compensate a person for his actual loss. * * *" (Par. Added)

Any tendency of the above excerpt to mislead the jury was adequately corrected in a timely manner by the court. The instructions to correct were full and complete.

## MOTION FOR A NEW TRIAL

### Assignment of Error 2.

We have read all the evidence, covering 300 pages of transcript paper. The appellant and appellees have submitted elaborate and comprehensive briefs that evidence exceptional diligence and effort to present the issues and law to this court. Further delineation of the evidence would unduly prolong and extend this opinion.

The damages recoverable under this action pursuant to Title 7, § 123, Code of Alabama 1940, are strictly punitive. See also Title 26, § 312, Code of Alabama 1940, as amended. They are based on the culpability of defendant, the enormity of the wrongful act, and the necessity of deterring similar wrongs. Juries, in the assessment of damages, are given much discretion, but not an unbridled or arbitrary one. The discretion so exercised must be honest, legal and sound.

A verdict supported by competent evidence, as here, will not be set aside because the appellate court might have reached a different conclusion. Southern Ry. Co. v. Smith, 221 Ala. 273, 128 So. 228 (12). Verdicts are presumed to be correct and no ground of a new trial is more carefully scrutinized and rigidly limited, than that the verdict is against the evidence. Smith v. Smith, 254 Ala. 404, 48 So.2d 546 (6). Where the presiding judge refused to grant a new trial, presumption in favor of

the verdict is strengthened. Smith v. Smith, supra, (7).

Finding no prejudicial error in the record before us, the judgment of the trial court is affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, while serving on the Supreme Court at the request of the Chief Justice, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and GOODWYN, MERRILL, and COLEMAN, JJ., concur.

Opinion corrected.

Application for rehearing overruled.